COMMONWEALTH *vs.* JOHN T. TEIXEIRA.

No. 94-P-1498.

Bristol. January 3, 1996. - March 27, 1996.

Present: KASS, IRELAND, & LENK, JJ.

*Rape. Deoxyribonucleic Acid. Evidence,* Scientific test. *Practice, Criminal,*
Failure to make objection.

Where, at a rape trial, the defendant did not raise the issue of the profi-
ciency of the laboratory that prepared and matched DNA in semen evi-
dence, this court declined to consider the issue on appeal, where there
was no substantial risk of a miscarriage of justice inasmuch as there was
fingerprint and blood match evidence that identified the defendant and
where the proficiency issue, in any event, would go to the weight of the
evidence and not to its admissibility. [239-240]
At a rape trial, testimony of an expert that a laboratory that had performed
certain tests had an error rate of zero, which the defendant did not
move to strike, was not required to be struck on the judge's own mo-
tion. [240-241]

INDICTMENTS found and returned in the Superior Court
Department on August 16, 1990.

A pretrial motion to exclude certain scientific evidence was
heard by *Richard G. Stearns*, J., and the cases were tried
before *John M. Xifaras*, J.

*Benjamin H. Keehn*, Committee for Public Counsel Ser-
vices, for the defendant.

*Elspeth B. Cypher*, Assistant District Attorney, for the
Commonwealth.

KASS, J. During the night of August 1, 1990, a masked in-
truder broke into a home in Acushnet and raped the victim,
who lived there with her two small children. Through
fingerprint comparison, blood serology analysis, and DNA[1]
matching, the prosecution identified the defendant John T.

---

[1]Deoxyribonucleic acid (DNA).

Teixeira as the assailant. A jury found Teixeira guilty of rape, breaking and entering a dwelling in the nighttime with intent to commit a felony, assault and battery by means of a dangerous weapon, and assault and battery.[2] Teixeira pitches his appeal primarily on the ground, not presented at trial, that the Federal Bureau of Investigation (FBI) expert who testified to the DNA match with the defendant's DNA profile failed to make a preliminary showing of the FBI laboratory's proficiency in generating accurate DNA match evidence. We affirm the convictions.

The history in Massachusetts of, first, critical appraisal and, ultimately, acceptance of DNA match evidence is written in *Commonwealth* v. *Curnin*, 409 Mass. 218 (1991); *Commonwealth* v. *Lanigan*, 413 Mass. 154 (1992); *Commonwealth* v. *Daggett*, 416 Mass. 347 (1993); and *Commonwealth* v. *Lanigan*, 419 Mass. 15 (1994) (*Lanigan II*). See also *Commonwealth* v. *Vega*, 36 Mass. App. Ct. 635, 637-638 (1994). We do not repeat the description of technology recounted in those opinions.

Here, presentation of the DNA match evidence accorded with the standards summarized in *Lanigan II*. There was testimony from a physical science technician, John Lawrence Quill, who was the supervisory special agent at the DNA unit of the FBI Laboratory. Quill described the methodology of DNA matching, including: how DNA is extracted from a specimen and then purified; the use of biological scissors to cut up the DNA; making the strands of DNA radioactive and producing an image through contact on X-ray film. From the images on the film, the technician makes an interpretation. The task of interpretation is done visually and also by computer assisted analysis of a digitalized form of the X-ray image.

In the course of making his analysis, Quill examined a control lane containing DNA from a known individual against which he compared each step of preparing the suspect's DNA sample for interpretation. That acted as a check against laboratory errors as the examination proceeded. There was also a

---

[2]The defendant received a sentence of from nineteen to twenty years at M.C.I., Cedar Junction, for the rape. For the breaking and entering in the nighttime, the judge imposed a sentence of from ten to fifteen years to be served from and after the previous sentence, suspended for ten years. The remaining convictions were placed on file.

process that Quill called "cell line control," by which he further monitored the technical accuracy of the preparation of DNA information for interpretive analysis. Examined as to the probability of error in matching, Quill thought that probability reduced to zero by reason of looking at four different locations on the DNA band. In making visual interpretations, Quill said there was a margin of error of 2.5%. That margin of error existed before what he thought was the more objective phase of computer analysis.

By application of the methodology he had described, Quill determined that the DNA profile of the defendant matched DNA taken from a vaginal swab, as well as that from semen extracted from a leotard worn by the victim.

The next question was the probability that the match might be a random one. As to that, the prosecution presented Bernard Devlin, a biostatistician from Yale University. In assessing the probability that the DNA might match with someone other than the defendant, Devlin applied the approach recommended by a committee of the National Research Council of the National Academy of Sciences in an April, 1992, report entitled "DNA Technology in Forensic Science" (the NRC Report). The NRC recommends calculating the odds of a random match against various population subgroups which might have a greater frequency of distinct genetic alleles. In the instant case, Devlin used data bases for Caucasians, for African-Americans, for southeastern Hispanics, and for southwestern Hispanics. He applied what has been described as the "ceiling principle," described by Devlin as calculating the upper bound of a range of probabilities, a method which reduces the odds — and, therefore, increases the probability — of a random match. On the basis of the NRC recommended technique, Devlin arrived at a determination that the probability of occurrence of the defendant's pattern of DNA was one in 266,000 for an unrelated individual (i.e., other than a blood relative) in the population. Devlin later altered the odds to 1:262,000.

The NRC Report considered as an additional significant variable the chance that a laboratory made a mistake in preparation and analysis. NRC Report at 88-89. Thwarted by

*Lanigan II*[3] from attacking the statistical methodology, the defense on appeal attacks the conviction on the basis that the government failed to adduce evidence of the proficiency of the FBI laboratory, and, thus, did not lay a proper foundation for admission of the DNA evidence. That is not wholly correct, however, as agent Quill did, in fact, testify about control methods on two occasions and, when squarely asked about error rates, responded that the error rate was reduced to zero by reason of his lab's method of multiple-sample analysis.

Infallibility would be remarkable in any laboratory, and the FBI's claim of it hung at trial as a ripe target for cross-examination or rebuttal. Critics of the FBI's posture of perfection point to the subjective factors that perforce are involved in DNA band matching, even in connection with the "objective" computer assisted analysis phase. Laboratory error leading to false matching may also occur as a result of confusion of DNA samples. See, e.g., Thompson, "Subjective interpretation, laboratory error and the value of forensic DNA evidence: three case studies," Genetica (January 1994).[4]

During neither the hearing on the motion to suppress nor the trial, however, did the defense raise the laboratory proficiency issue. With five relatively rare exceptions, an appellate court does not consider an issue that was not raised at trial. *Commonwealth* v. *Young*, 401 Mass. 390, 404 (1987). *Commonwealth* v. *Miranda*, 22 Mass. App. Ct. 10, 14 (1986). *Commonwealth* v. *Almeida*, 34 Mass. App. Ct. 901, 903 (1993). Two of those exceptions,[5] potentially applicable in this case, are when the reviewing court apprehends that there is a substantial risk of a miscarriage of justice, *Commonwealth* v. *Freeman*, 352 Mass. 556, 563-564 (1967), or when the law relating to the asserted constitutional error has not yet been fully developed, the clairvoyance exception. *Commonwealth* v. *Miranda*, 22 Mass. App. Ct. at 16.

[3]Decided in November, 1994, well after Teixeira's trial, which occurred in April, 1993.

[4]Although the Thompson article was written after the Teixeira trial, the issue of laboratory error was discussed in the NRC Report. That report was not only available but referred to during the trial proceedings, including the suppression motion.

[5]For a discussion of the five exceptions to the traditional rule that a point not raised at trial is barred on appeal, see *Commonwealth* v. *Miranda*, 22 Mass. App. Ct. 10, 15-18 (1986).

Concern about a risk of miscarriage of justice is much alleviated by the fingerprint and blood match evidence. Kathleen Stefani, the fingerprint expert for the government, was obliged to explain away as a striation from fiberglass siding, a line of dissimilarity between the fingerprint lifted from the point of entry into the victim's house and the print taken from the suspect. Stefani was nonetheless "100% certain that the latent print on Lift No. 1 is in fact the left ring finger as indicated on the card with the name John Teixeira on it." There was also evidence from a forensic chemist that blood taken from the victim's leotard was of a type (type A) and secreter characteristic (PGM subtype of one plus two plus) that matched the blood type and subtype of the defendant. In the general population, 7.1% have those blood characteristics, placing the defendant in a category of persons who could not be excluded as suspects. The concurrence in result of the three separate scientific tests allay, as we have suggested, concern that a miscarriage of justice may have occurred.

As to clairvoyance about laboratory proficiency testing, that issue, as indicated, had been discussed in the NRC Report. The prosecution delved into proficiency questions, however lightly, and we think that thereafter it fell to the defense to explore weaknesses in how scientists and technicians at the FBI laboratory went about their work and arrived at their conclusions. It was not the burden of the prosecution to disprove all categories of uncertainty in the FBI laboratory's DNA methodology. Weaknesses in the laboratory's proficiency testing went to the weight to be ascribed to the evidence of match, not to its admissibility. See *United States* v. *Bonds*, 12 F.3d 540, 560 (6th Cir. 1993). *State* v. *Anderson*, 118 N.M. 284, 297-298 (1994).

Finally, the defense argues that agent Quill's assertion that he knew of no false positives was tantamount to scientific fraud and fatally infected the prosecution. There was no motion to strike that testimony. The defendant shies away from claiming ineffective assistance of counsel, and well he should, as his trial counsel mounted a vigorous and informed assault on the three categories of scientific evidence adduced by the prosecution. The judge was not bound, on his own, to strike or comment upon Quill's testimony as to error rate. It may

have been scientifically and statistically unsound for Quill to claim a laboratory error rate of zero, but that proposition is not so ordinary and obvious that a judge should be held to take judicial notice of it.

*Judgments affirmed.*