559 S.E.2d 318

**The STATE, Respondent,**

v.

**Duncan R. PROCTOR, Appellant.**

**No. 3414.**

Court of Appeals of South Carolina.

Heard Sept. 27, 2001.
Decided Dec. 3, 2001.
Revised Dec. 6, 2001.
Rehearing Denied Feb. 21, 2002.

Chief Attorney Daniel T. Stacey, of South Carolina Office of Appellate Defense, of Columbia; and Christopher Wayne Adams, Southern Center for Human Rights, of Atlanta, GA, for Appellant.

Attorney General Charles M. Condon, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Robert E. Bogan and Assistant Attorney General Toyya Brawley Gray, all of Columbia; and Solicitor David P. Schwacke, of N. Charleston, for Respondent.

ANDERSON, J.:

Duncan Proctor was convicted of four counts of first degree criminal sexual conduct (CSC) and one count of first degree burglary. The trial court sentenced Proctor to life imprison-

ment for first degree burglary; one consecutive thirty year term as to one count of first degree CSC; and three concurrent terms of thirty years on the remaining CSC convictions. On appeal, Proctor argues the court erred in (1) denying Proctor's motion to have the proficiency testing records of the DNA expert disclosed and (2) finding Proctor was competent to stand trial. We affirm in part and remand.

## *FACTS/PROCEDURAL BACKGROUND*

On April 1, 1991, Victim woke to find a mask-wearing intruder standing in the doorway of her bedroom. The intruder grabbed her arm, held a knife to her neck, and told her to remove her nightgown. The intruder led Victim into one of the guest bedrooms where he repeatedly raped her at knife point. Sometime during the attacks, the intruder removed his mask, placed it across Victim's face, and warned her not to look at his face. He threatened to kill her if she later called the police. The intruder entered Victim's home through a window.

While committing the criminal sexual conduct, the intruder used a tube of K–Y Jelly. He cleansed himself with a lace doily and a wash cloth during the attacks. Although Victim observed that her attacker had a slight build, olive skin, and wavy dark hair, she did not see his face and could not identify him.

On June 19, 1992, an informant told the City of Charleston Police Department that Proctor was involved in the criminal sexual conduct. Proctor had olive skin, a slight build, and wavy dark brown hair. When the police approached Proctor that day, Proctor sped away in his car and was involved in a serious automobile accident. Proctor suffered massive brain damage and lost the use of both his legs and his right arm. Proctor's brain injuries impaired his ability to think, remember, and concentrate.

Deoxyribonucleic acid (DNA) analysis identified Proctor as the source of semen collected from Victim during the rape kit examination. The fingerprint analysis performed on prints left on Victim's window screen and on the tube of K–Y Jelly indicated that Proctor was the source of the fingerprints. The

blood-type of the attacker, Group B secretor, and hair found at the scene were consistent with that of Proctor.

In December 1992, Proctor was indicted on four counts of first degree CSC and one count of burglary in connection with the rape of Victim. On May 26, 1993, the trial court found Proctor incompetent to stand trial. When his competency was later reviewed, Proctor was declared competent to stand trial pursuant to an order dated June 17, 1997. Venue was transferred to Oconee County.

In his DNA discovery request filed prior to trial, Proctor requested the State turn over all internal and external proficiency tests and all proficiency test results. Proctor submitted a memorandum in which he contended the proficiency test results were discoverable under Rule 5, SCRCrimP, and *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Proctor maintained the proficiency test results would be used as evidence at trial, the results were material to the defense, and the raw data to support them was not confidential. Additionally, Proctor alleged that every laboratory makes errors in performing DNA analysis. He presented copies of reports concerning the proficiency test errors made at the Federal Bureau of Investigation's (FBI's) lab and the lab's efforts to hide the errors.

In a memorandum in opposition to Proctor's discovery request, the South Carolina Law Enforcement Division (SLED) averred the test results were not discoverable under either Rule 5 or *Brady* because Proctor could not show how the proficiency test results were favorable or material. SLED argued the test results were confidential, compiling the reports would be burdensome, and the proficiency test results were not relevant to the evidence tested in Proctor's case. SLED provided the affidavit of Ira Jeffcoat, the SLED agent who performed the DNA analysis in Proctor's case. In his affidavit, Agent Jeffcoat stated all SLED examiners had passed every proficiency test. He further declared that revealing the results of all proficiency tests would be extremely burdensome on SLED and would destroy the confidentiality of the testing process. The State asserted it had no plans to introduce the proficiency test results in its case in chief at trial.

After a hearing, the trial court denied discovery of the DNA proficiency test results. The trial court ruled the proficiency test results were not discoverable under Rule 5 because the State indicated it would not use the proficiency test results in its case in chief and the results did not relate to any evidence in Proctor's case. The court concluded the results were not material to the preparation of Proctor's defense. The trial court found Proctor would be provided enough information regarding the DNA evidence for his expert witnesses to assess whether Agent Jeffcoat reached the correct conclusion. The court noted Agent Jeffcoat's affidavit provided Proctor with information regarding the proficiency tests.

In addition, the trial court determined Proctor was not entitled to the proficiency test results under *Brady* because Proctor failed to show an initial basis for his claim that the results were material and favorable to his defense and Proctor only offered unsupported speculations that problems existed with SLED's proficiency testing. The court held the proficiency test results were not relevant to the question of whether Agent Jeffcoat reached the correct conclusions in Proctor's case. Finally, the court found that compiling a proficiency testing report would be burdensome to SLED.

At trial, Agent Jeffcoat explained accreditation and proficiency testing. In 1994, the SLED forensic laboratory became accredited. The agency which determines SLED's accreditation status is the American Society of Crime Laboratory Directors (ASCLD). Agent Jeffcoat declared that accredited means "our procedures in our lab have been inspected by an outside agency, that agency being the [ASCLD]." An important aspect of SLED's quality control program involves proficiency testing.

According to Agent Jeffcoat, for the SLED forensic laboratory to maintain its accreditation status, the ASCLD requires an outside agency to periodically inspect the SLED laboratory and conduct proficiency testing on every forensic examiner. In a proficiency test, an examiner is given known and unknown DNA samples in order to determine if they match. Each examiner is given two open tests a year, in which the examiner knows the samples are part of a proficiency test. In addition, SLED examiners are given one blind proficiency test

per year, where the examiners are not informed the samples are part of a proficiency test and the samples are provided as if part of a normal case. The examiners receive a grade of either "pass" or "fail."

## ISSUES

I. Did the trial court err in denying Proctor's motion to have the proficiency testing records of the DNA expert disclosed?

II. Did the trial court err in finding Proctor was competent to stand trial?

## STANDARD OF REVIEW

### Discovery Orders

■ Adverse orders regarding discovery may be reviewed on appeal but they must be affirmed unless the trial court abused its discretion. *See State v. Newell,* 303 S.C. 471, 401 S.E.2d 420 (Ct.App.1991).

### Trial Court's Finding of Competency to Stand Trial

■ On appeal, this Court will affirm a trial court's determination of competency if it has evidentiary support and is not against the preponderance of the evidence. *State v. Nance,* 320 S.C. 501, 466 S.E.2d 349 (1996).

## LAW/ANALYSIS

### I. DNA Proficiency Test Records

Proctor argues the trial court erred in denying his motion "to have the proficiency testing records of the DNA expert disclosed." He asserts the proficiency test results were discoverable under Rule 5, SCRCrimP, and pursuant to *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

The admissibility of DNA evidence in a criminal trial is a major event in regard to evidence against a defendant. The efficacy of DNA evidence is recognized by all afficionados in the criminal trial venue. The DNA expert conducting the analysis is a pivotal player in the laboratory activity. In order to be an accredited laboratory for DNA purposes, the profi-

ciency rate of the DNA examiners is critical in analyzing the reliability of the testing procedure. Accreditation of the laboratory is only allowed if outside monitoring of the DNA examiners is done on the basis of blind and open proficiency tests. The gravamen of the discovery request in the case *sub judice* is the production of the DNA proficiency rating by the outside laboratory.

In the novel and intriguing evidentiary issue presented in this case, we explore the cornucopia of developing scientific knowledge as meshed with the precepts of due process. The State distills from prior precedent that the defendant is only entitled to limited information in the DNA theater of operations.

Agent Ira Jeffcoat filed an affidavit averring that all SLED examiners had passed every proficiency test. Two documents which address the issues concerning forensic DNA analysis and proficiency testing are the National Research Council Report published in 1992 (NRC I) and a second report published in 1996 (NRC II). Both documents agree that no laboratory has a zero error rate. The NRC I provides: "Laboratory error rates should be measured with appropriate proficiency tests and should play a role in the interpretation of results of forensic DNA typing. As discussed above, proficiency tests provide a measure of the false-positive and false-negative rates of a laboratory. *Even in the best of laboratories, such rates are not zero.*" NRC I, p. 94 (emphasis added). The NRC II reads: "It addresses determination of DNA profiles and considers how laboratory errors (particularly false matches) can arise, how errors might be reduced, and how to take into account the fact that *the error rate can never be reduced to zero.*" NRC II, back cover (emphasis added).

SLED takes the position that Agent Jeffcoat's affidavit is sufficient. The French phrase "pas du tout"[1] is applicable. Are the court and defense counsel required to accept the self-serving assertion by the SLED examiner that he and the other DNA examiners passed all proficiency testing? Does the law allow any meaningful review of the background and qualification of a DNA examiner? Are all litigants in a DNA evidence scenario bound by the statement emanating from the

---

1. Not at all, not so.

DNA expert witness that he or she passed all proficiency rating testing?

A commonsensical analysis compels this Court to conclude that a DNA expert, like all expert witnesses, is subject to scrutiny and query in regard to qualification and competency. Historically, this State has ruled that the expertise, ability and acumen of an expert witness is relevant and essential. No citation of authority is needed for the well settled rule of practice and procedure that every expert witness is subject to *voir dire* examination by the opposing party as to his or her qualifications before a final ruling by the trial judge is made as to competency or incompetency of the proffered expert witness.

## A. Rule 5, SCRCrimP

Proctor argues the proficiency test results were discoverable pursuant to Rule 5, SCRCrimP. We agree.

■ The requirements of Rule 5, as opposed to the constitutional dictates of *Brady*, are judicially created discovery mechanisms for use in criminal proceedings. *See State v. Kennerly*, 331 S.C. 442, 503 S.E.2d 214 (Ct.App.1998), *aff'd*, 337 S.C. 617, 524 S.E.2d 837 (1999). Rule 5 imposes different duties than *Brady*. *Id.* Rule 5(a)(1)(D), SCRCrimP, provides:

Reports of Examinations and Tests. Upon request of a defendant the prosecution shall permit the defendant to inspect and copy any results or reports ... of scientific tests or experiments, or copies thereof, which are within the possession, custody, or control of the prosecution, the existence of which is known, or by the exercise of due diligence may become known, to the attorney for the prosecution, and which are *material to the preparation of the defense* or are *intended for use by the prosecution as evidence in chief at the trial.* (Emphasis added).

■ "The definition of 'material' for purposes of Rule 5 is the same as the definition used in the *Brady* context." *Kennerly*, 331 S.C. at 453, 503 S.E.2d at 220. Evidence is "material" under *Brady* only if there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different. *State v. Von Dohlen*, 322 S.C. 234, 471 S.E.2d 689 (1996). Once a Rule 5 violation is

shown, reversal is required only where the defendant suffered prejudice from the violation. *State v. Trotter,* 322 S.C. 537, 473 S.E.2d 452 (1996); *Kennerly,* 331 S.C. at 453–54, 503 S.E.2d at 220.

The proficiency test results could very well be material to the preparation of Proctor's defense. All proficiency test results of the DNA analyst involved in the case must be produced. Defense counsel has the right to cross examine the DNA analyst regarding his or her performance on proficiency tests. A failing grade by the DNA analyst on his or her proficiency tests is clearly relevant in the judge's evaluation of the expert's competency and most probably reflects negatively on the reliability of the DNA evidence introduced at trial. The trial court abused its discretion in denying discovery of the proficiency test results pursuant to Rule 5.

As to the second prong of Rule 5, the State asserted prior to trial that it had no plans to introduce the proficiency test results in its case in chief at trial. During direct examination of Agent Jeffcoat at trial, the State questioned him about the SLED laboratory's qualifications to perform DNA analysis. In describing SLED's quality control program, Agent Jeffcoat testified regarding proficiency testing. When instructed by the State to "let the jury know how you are doing on your proficiency test," Agent Jeffcoat responded: "In every occasion where we have been provided proficiency tests, we've always called the correct match." Defense counsel objected stating, "Your Honor, at this point I renew my objection and ask to be allowed to see the underlying data of those proficiency tests." The judge ruled: "That's noted for the record and denied on the same basis as before." Thereafter, Agent Jeffcoat declared: "In all cases in which we have received proficiency tests, we have always made the correct match. We've always matched the donor evidence with the donor in all cases that we've been tested."

A voracious review of the trial testimony leads to the ineluctable conclusion that the State did in fact use the examinations and tests in the State's evidence in chief at the trial. Agent Jeffcoat testified with exactitude in reference to the proficiency test results and the acumen possessed by the DNA SLED examiners.

## B. *Brady v. Maryland*

Proctor asserts he was entitled to the proficiency test results pursuant to *Brady* because he needed the test results for impeachment purposes. We agree.

Compliance with *Brady* is a constitutional requirement. *See State v. Kennerly*, 331 S.C. 442, 503 S.E.2d 214 (Ct.App. 1998), *aff'd*, 337 S.C. 617, 524 S.E.2d 837 (1999). The *Brady* disclosure rule is grounded in the defendant's fundamental right to a fair trial mandated by the Due Process Clause of the Fifth and Fourteenth Amendments. *Id.*

*Brady* requires the prosecution to disclose evidence which is favorable to a defendant and material to guilt or punishment. This applies to impeachment evidence as well as exculpatory evidence. *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); *State v. Von Dohlen*, 322 S.C. 234, 471 S.E.2d 689 (1996). Evidence is "material" under *Brady* only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *Bagley*, 473 U.S. at 682, 105 S.Ct. at 3383, 87 L.Ed.2d at 494; *State v. Cain*, 297 S.C. 497, 377 S.E.2d 556 (1988). A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. *Bagley*, 473 U.S. at 682, 105 S.Ct. at 3383, 87 L.Ed.2d at 494; *State v. Taylor*, 333 S.C. 159, 508 S.E.2d 870 (1998). Reversal of a conviction is required only if the undisclosed evidence is material and the omission deprived the defendant of a fair trial. *State v. Jones*, 325 S.C. 310, 479 S.E.2d 517 (Ct.App. 1996); *State v. Freeman*, 319 S.C. 110, 459 S.E.2d 867 (Ct. App.1995).

In *State v. Bryant*, 307 S.C. 458, 415 S.E.2d 806 (1992), our Supreme Court discussed the materiality prong of *Brady*:

[T]he State must produce undisclosed evidence for the trial judge's inspection *once a defendant has established a basis for his claim that it contains material exculpatory or impeachment evidence.* The trial judge should then rule upon the materiality of the evidence to determine whether the State must produce it for the defendant's use.

*Bryant*, 307 S.C. at 461–62, 415 S.E.2d at 808–09 (emphasis added)(citing *Pennsylvania v. Ritchie*, 480 U.S. 39, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987)).

In the present case, the undisclosed proficiency test results could very well be material to Proctor's case for impeachment and important for cross-examination purposes. SLED's contention that compiling the reports would be burdensome has no merit. After the tests were completed, the outside laboratory compiled the data and turned it over to SLED. We find the trial court abused its discretion in refusing to order disclosure of the proficiency test results pursuant to *Brady*.

## C. Other Jurisdictions

In some jurisdictions, a defendant is provided the underlying proficiency test results in discovery. *See Hodges v. Commonwealth*, 26 Va.App. 43, 492 S.E.2d 846 (1997)(where the trial court ordered discovery of the proficiency test data and the parties agreed the lab would provide a memorandum recounting the proficiency testing of a particular examiner, the trial court correctly exercised its discretion in denying the defendant's motion for further discovery regarding the underlying details of the test results); *Keen v. Commonwealth*, 24 Va.App. 795, 485 S.E.2d 659 (1997)(although the appellate court presumed that the trial court erred in refusing to allow discovery of the underlying proficiency test results, the error was deemed harmless in light of the other evidence presented at trial).

Academically and fundamentally, the issue has been dissected into relevant and consequential query to be used at trial before the fact finder. A review of cases in other jurisdictions reveals a plethora of issues raised relating to DNA proficiency tests:

- Is the laboratory error rate relevant in the calculation of the overall odds claimed by the DNA analyst?
- Is the proficiency test data relevant to the credibility of the DNA evidence?
- Should the jury be allowed to consider proficiency test results/records along with the DNA matching data?
- Does the DNA examiner's performance on the proficiency tests go to the weight of the DNA evidence?

*See, e.g., State v. Tankersley*, 191 Ariz. 359, 956 P.2d 486 (1998)(determining that if procedures implementing a scienti-

fically accepted testing principle are so seriously flawed that results are rendered unreliable, trial court should not admit the evidence, but once adequate foundation is established, complaints of laboratory error or incompetence are considered by trier of fact in assessing weight of evidence); *Commonwealth v. Teixeira*, 40 Mass.App.Ct. 236, 662 N.E.2d 726 (1996)(explaining weaknesses in laboratory's proficiency testing go to weight to be ascribed to evidence of DNA match, not to its admissibility); *State v. Moore*, 268 Mont. 20, 885 P.2d 457 (1994), *overruled on other grounds by State v. Gollehon*, 274 Mont. 116, 906 P.2d 697 (1995)(finding challenge to proficiency testing of DNA expert goes to weight of evidence, not its admissibility; even if error rate of expert's proficiency tests presented challenge to reliability of polymerase chain reaction analysis, that argument would not result in exclusion of PCR evidence, as error rate would only be one factor considered in determining admissibility); *Keen v. Commonwealth*, 24 Va.App. 795, 485 S.E.2d 659 (1997)(concluding that even if the proficiency test results of expert had been admitted and could have been used by Keen to establish state laboratory had previously made erroneous findings, this information would not have affected admissibility of the DNA evidence, but rather, would have only affected the weight the fact finder accorded the DNA evidence); *State v. Copeland*, 130 Wash.2d 244, 922 P.2d 1304 (1996)(holding that laboratory error is a matter of weight and not admissibility under *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923); under Rule of Evidence 702, if lab error or error rates are so serious that results are not helpful to the jury, the trial court may in its discretion rule the evidence inadmissible); *State v. Cauthron*, 120 Wash.2d 879, 846 P.2d 502, 512 (1993)(noting that thorough cross-examination of State's experts on possibility of error in laboratory and errors in proficiency tests allowed jury to get "a balanced picture" of the DNA evidence); National Research Council, *The Evaluation of Forensic DNA Evidence* (1996)(stating proficiency testing bears on weight that should be accorded forensic test results).

### D. Harmless Error

The State maintains that, even if the trial judge erred in denying disclosure of the proficiency test results under Rule 5 or *Brady*, such error is harmless. We disagree.

The trial judge in the instant case erred in denying disclosure of the proficiency test results under Rule 5 and *Brady.* Clearly, the error was *not* harmless. Ignoring the DNA evidence presented at trial, there was substantial disputation of evidence regarding guilt. The record does not disclose overwhelming evidence to support Proctor's conviction in the absence of the DNA evidence. We hold there is a reasonable probability that the disclosure of SLED's proficiency test results would reasonably have affected the outcome of the trial. *See State v. Mitchell,* 286 S.C. 572, 336 S.E.2d 150 (1985)(error is harmless when it could not reasonably have affected the result of the trial).

## II. Competency

Proctor contends the trial court erred in finding him competent to stand trial. We disagree.

A trial court's determination of competency will be upheld on review if it has evidentiary support and is not against the preponderance of the evidence. *State v. Nance,* 320 S.C. 501, 466 S.E.2d 349 (1996). "The test for competency to stand trial or continue trial is whether the defendant has the sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and whether he has a rational, as well as a factual, understanding of the proceedings against him." *State v. Bell,* 293 S.C. 391, 395–96, 360 S.E.2d 706, 708 (1987)(citing *Dusky v. United States,* 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960)). The defendant bears the burden of proving his incompetence by a preponderance of the evidence. *Nance,* 320 S.C. at 504, 466 S.E.2d at 351; *State v. Lee,* 274 S.C. 372, 264 S.E.2d 418 (1980).

Proctor was found incompetent to stand trial in 1993. The State moved to have Proctor re-evaluated in 1996. A competency hearing was held in May 1997.

Dr. Jeffrey R. McKee, a forensic psychologist, and Dr. Donald Morgan, a forensic psychiatrist, evaluated Proctor to determine competency. During those evaluations, Proctor stated that he faced charges of "rape," breaking and entering, and assault. Proctor indicated he understood (1) the nature of

the competency hearing; (2) that he could be found guilty and sentenced to prison at trial; and (3) that his attorney's role was to prove him not guilty and to consult with Proctor before Proctor answered certain questions.

Dr. McKee declared that, although Proctor suffered a deficit in his short term memory and could not name his attorneys, he could recall new information and gain an understanding of judicial proceedings if prompted by his attorney or given a summary of the proceedings. Dr. Donald Morgan testified Proctor was competent to stand trial, understood the charges against him and the nature of the proceedings, and was able to consult with his attorneys, in spite of Proctor's severe brain damage. Dr. Morgan opined that, despite Proctor's amnesia of events surrounding the time period of the rapes, he could assist in his defense to the extent that he could discuss witness testimony at trial and evaluate legal options. Despite Proctor's severe brain damage and memory deficits, both physicians found Proctor competent to stand trial.

Dr. Harold Morgan, a forensic psychiatrist, stated Proctor was not competent to stand trial. He believed Proctor had a factual understanding of the charges against him, but could not adequately consult with his attorneys because he could not recall the discussions. Dr. Morgan noted that, although Proctor could learn some things by repetition, Proctor could not recall names and could not recall information after any amount of time passed. He found Proctor would need a lot of assistance from his attorneys during a trial because Proctor lost things from his memory very quickly and did not have the "very kind of memory he needs for assisting his attorneys and competently participating in his trial." According to Dr. Morgan, Proctor's attorneys would have to constantly go over the events of each day during trial, including the events of the previous days, in order for Proctor to try to understand the proceedings.

On June 17, 1997, the trial court issued an order finding Proctor competent to stand trial. The court stated Proctor conceded he had a factual understanding of the proceedings against him. In evaluating Proctor's ability to assist his

attorneys, the trial court determined Proctor could communicate with his attorneys and Proctor's memory deficits could be corrected through reviews with his attorneys. The trial judge further noted his personal observations that Proctor was attentive, reacted appropriately, and consulted with his attorneys throughout the competency proceedings.

Another competency hearing was held immediately preceding Proctor's March 1998 trial. Dr. Harold Morgan testified Proctor suffered from severe memory deficits and could not retain new information. According to Dr. Morgan, Proctor would not be able to follow highly complicated testimony, such as DNA testimony, nor would he be able to comprehend or retain information about the process of plea negotiations for a long period of time. Although Proctor indicated he understood he had a right to trial, Dr. Morgan opined that Proctor could not assist his attorneys in the preparation of his defense. Dr. Morgan confirmed his opinion from the prior competency proceeding that Proctor was not competent to stand trial.

Dr. Thomas William Behrmann, a psychiatrist, testified for the State regarding Proctor's competency. After reviewing the records from Proctor's prior competency evaluations and meeting with Proctor three times, Dr. Behrmann concluded Proctor was competent to stand trial. Dr. Behrmann based his finding on Proctor's ability to understand the charges against him, appreciate the seriousness of those charges, comprehend the adversarial process, and interact with defense counsel in a helpful manner. Dr. Behrmann believed Proctor's ability to communicate with his attorneys had improved over time. At the end of Dr. Behrmann's testimony, Proctor's counsel informed the trial court that Proctor told her he did not meet with Dr. Behrmann three times nor did he understand what he was testifying about.

Proctor testified at the competency hearing. Proctor could not recall the names of the two physicians who had testified prior to him. He could not remember jury selection or anything said about the legal process.

The trial court affirmed its prior finding that Proctor was competent to stand trial. The trial court noted Proctor's

ability to recall appeared to improve. The trial court observed Proctor "does have recollection of this process and has been here all day," responded to questions asked of him, and appeared able to assist his attorneys.

During breaks in testimony throughout the trial, Proctor's counsel informed the court when Proctor would indicate to counsel that he did not understand something or when Proctor could not recall the events of the day.

Proctor concedes he had a factual understanding of the proceedings against him. He contends the trial court erred in finding him competent to stand trial because his memory deficits rendered him unable to rationally assist his attorneys with the defense. Although there was evidence that Proctor was unable to recall some information unless it was constantly repeated, Proctor did not meet his burden of proving he was unable to assist his attorneys. Proctor understood the nature of the charges against him, the seriousness of the charges, and the adversarial nature of the proceedings. He consulted his attorneys when he had questions. Despite Proctor's amnesia regarding the events surrounding the crime, he was able to rationally discuss the trial proceedings with counsel and comprehend them.

We conclude there was ample evidence to support the trial court's finding that Proctor was competent to stand trial. Further, the trial judge's determination of competency is not against the preponderance of the evidence.

### CONCLUSION

We find the trial judge did not err in finding Proctor competent to stand trial. The State's evidence reveals that Proctor has the sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and Proctor possesses a rational, as well as a factual, understanding of the proceedings against him.

We conclude the trial court erred in denying Proctor's motion to have the proficiency test records of the DNA expert disclosed. We hold that, pursuant to Rule 5, SCRCrimP and

*Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), a defendant is entitled to the pre-trial production of DNA proficiency test records of the SLED DNA expert. We bifurcate the mandate of production:

1) outside laboratory proficiency tests and records and

2) SLED laboratory proficiency tests and records.

As to the outside laboratory proficiency tests and records done in the accreditation process, we order the pre-trial production of *all* records of proficiency testing of personnel in the laboratories where Restriction Fragment Length Polymorphism (RFLP) and Polymerase Chain Reaction (PCR) analyses, the two types of DNA testing procedures, are performed in the case and records of laboratory error rates resulting from external blind forensic DNA analyses or any other studies pertaining to error rates.

As to the SLED laboratory proficiency tests and records, we limit the production to the *results* of proficiency testing of personnel and the *results* of laboratory error rates resulting from internal blind forensic DNA analyses or any other studies pertaining to error rates.

Accordingly, we remand the case to the Charleston County Court of General Sessions and direct that an *in camera Bryant* hearing be held to determine whether the records and information produced are *material* to the defendant's case. If the Circuit Court Judge [2] concludes the records and information are material, the judge shall order a new trial. If the records and information are *not* material, the Circuit Judge shall affirm the convictions of Duncan R. Proctor.

**AFFIRMED IN PART and REMANDED.**

HEARN, C.J., and CURETON, J., concur.

---

**2.** We note the trial judge has retired. The remand of this case is to the Circuit Court. Any Circuit Judge assigned to the Charleston County venue has jurisdiction to conduct the *in camera Bryant* hearing.