556 S.E.2d 418

The STATE, Respondent,

v.

Duncan PROCTOR, Appellant.

No. 3415.

Court of Appeals of South Carolina.

Heard Sept. 27, 2001.

Decided Dec. 3, 2001.

Revised Dec. 6, 2001.

Rehearing Denied Feb. 21, 2002.

588

Chief Attorney Daniel T. Stacey, of South Carolina Office of Appellate Defense, of Columbia; and Christopher Wayne Adams, of Southern Center for Human Rights, of Atlanta, GA, for Appellant.

Attorney General Charles M. Condon, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Robert E. Bogan and Assistant Attorney General Toyya Brawley Gray, all of Columbia; and Solicitor Walter M. Bailey, of Summerville, for Respondent.

ANDERSON, Judge:

Duncan Proctor was convicted of first degree burglary, first degree criminal sexual conduct (CSC), assault with intent to kill (AWIK), and possession of a firearm during the commis-

sion of a violent crime. The trial court sentenced Proctor to life imprisonment for first degree burglary; one consecutive thirty year term for first degree CSC; one concurrent term of five years for AWIK; and one concurrent term of one year for possession of a firearm. On appeal, Proctor argues the court erred in (1) denying Proctor's motion to have the proficiency testing records of the DNA expert disclosed and (2) finding Proctor was competent to stand trial. We affirm in part and remand.

## FACTS/PROCEDURAL BACKGROUND

On August 3, 1991, Victim was awakened early in the morning when an intruder sat on her and forced her arms over her head. The intruder placed a silver or light-colored gun to Victim's head, hit her head on the bed, and threatened to kill her if she did not remain quiet. The intruder pulled the trigger of the gun several times.

Holding her neck, the intruder forced Victim downstairs to the living room where he repeatedly raped her. Several outside lights shined into Victim's windows, and she could see her attacker's face and complexion. During the attacks, the intruder mentioned Victim's daughter by name and threatened to kill her daughter if Victim told anyone about the rape. Victim was unable to call for help after the intruder left because the cords on all three of her telephones had been cut.

Victim was taken to a hospital for evaluation and a rape kit was performed. Evidence collected at the hospital included Victim's gown, unknown pubic hairs, and semen. Material identified at the crime scene included semen on the carpet and the couch, fingerprints, and a shoe imprint outside the apartment. Victim met with a police sketch artist, who drew a composite of Victim's attacker based on her description.

On June 19, 1992, the City of North Charleston Police Department received information which led to the surveillance of Proctor. When police approached him that day, Proctor sped away in his car and led police on a high-speed chase. Proctor was involved in a serious automobile accident, suffering severe injuries to his head, both legs, and his right arm. A silver gun was retrieved from Proctor's car at the scene of the accident.

Deoxyribonucleic acid (DNA) analysis identified Proctor as the source of semen collected during the rape kit examination. The pubic hair found on Victim was consistent with Proctor's pubic hair. Proctor's blood type was consistent with that of Victim's attacker. None of the fingerprints collected from the scene matched Proctor's fingerprints. The shoe imprint taken from outside Victim's apartment did not match shoes owned by Proctor.

Proctor was indicted in Dorchester County for first degree burglary, first degree CSC, AWIK, and possession of a firearm during the commission of a violent crime. Venue was transferred to Cherokee County.

In his DNA discovery request filed prior to trial, Proctor requested the State turn over all internal and external proficiency tests and all proficiency test results. Proctor submitted a memorandum in which he contended the proficiency test results were discoverable under Rule 5, SCRCrimP, and *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Proctor maintained the proficiency test results would be used as evidence at trial, the results were material to the defense, and the raw data to support them was not confidential. Additionally, Proctor alleged that every laboratory makes errors in performing DNA analysis. He presented copies of reports concerning the proficiency test errors made at the Federal Bureau of Investigation's (FBI's) lab and the lab's efforts to hide the errors.

In a memorandum in opposition to Proctor's discovery request, the South Carolina Law Enforcement Division (SLED) averred the test results were not discoverable under either Rule 5 or *Brady* because Proctor could not show how the proficiency test results were favorable or material. SLED argued the test results were confidential, compiling the reports would be burdensome, and the proficiency test results were not relevant to the evidence tested in Proctor's case. SLED provided the affidavit of Ira Jeffcoat, the SLED agent who performed the DNA analysis in Proctor's case. In his affidavit, Agent Jeffcoat stated all SLED examiners had passed every proficiency test. He further declared that revealing the results of all proficiency tests would be extremely burdensome on SLED and would destroy the confidentiality of

the testing process. The State asserted it had no plans to introduce the proficiency test results in its case in chief at trial.

After a hearing, the trial court denied discovery of the DNA proficiency test results. The trial court ruled the proficiency test results were not discoverable under Rule 5 because the State indicated it would not use the proficiency test results in its case in chief and the results did not relate to any evidence in Proctor's case. The court concluded the results were not material to the preparation of Proctor's defense. The trial court found Proctor would be provided enough information regarding the DNA evidence for his expert witnesses to assess whether Agent Jeffcoat reached the correct conclusion. The court noted Agent Jeffcoat's affidavit provided Proctor with information regarding the proficiency tests.

In addition, the trial court determined Proctor was not entitled to the proficiency test results under *Brady* because Proctor failed to show an initial basis for his claim that the results were material and favorable to his defense and Proctor only offered unsupported speculations that problems existed with SLED's proficiency testing. The court held the proficiency test results were not relevant to the question of whether Agent Jeffcoat reached the correct conclusions in Proctor's case. Finally, the court found that compiling a proficiency testing report would be burdensome to SLED.

At trial, Victim positively identified Proctor as her attacker. She testified the gun found in Proctor's car was similar in size and color to the one used in her attack.

Agent Jeffcoat explained accreditation and proficiency testing. In 1994, the SLED forensic laboratory became accredited. The agency which determines SLED's accreditation status is the American Society of Crime Laboratory Directors (ASCLD). Agent Jeffcoat declared that accreditation means "you have accepted . . . a set of standards that you want your lab to adhere to. Those standards include things such as protocol and a protocol validation, quality control measures, guidelines on the qualifications for your employees, validation procedures for each new test that you bring on line. Different aspects of setting up a lab."

According to Agent Jeffcoat, for the SLED forensic labora-
tory to maintain its accreditation status, the ASCLD requires
an outside agency to periodically inspect the SLED laboratory
and conduct proficiency testing on every forensic examiner.
In a proficiency test, an examiner is given known and un-
known DNA samples in order to determine if they match.
Each examiner is given two open tests a year, in which the
examiner knows the samples are part of a proficiency test. In
addition, SLED examiners are given one blind proficiency test
per year, where the examiners are not informed the samples
are part of a proficiency test and the samples are provided as
if part of a normal case. The examiners receive a grade of
either "pass" or "fail."

## ISSUES

I. Did the trial court err in denying Proctor's motion to
have the proficiency testing records of the DNA expert
disclosed?

II. Did the trial court err in finding Proctor was compe-
tent to stand trial?

## STANDARD OF REVIEW

### Discovery Orders

Adverse orders regarding discovery may be reviewed
on appeal but they must be affirmed unless the trial court
abused its discretion. *See State v. Newell,* 303 S.C. 471, 401
S.E.2d 420 (Ct.App.1991).

### Trial Court's Finding of Competency to Stand Trial

On appeal, this Court will affirm a trial court's deter-
mination of competency if it has evidentiary support and is not
against the preponderance of the evidence. *State v. Nance,*
320 S.C. 501, 466 S.E.2d 349 (1996).

## LAW/ANALYSIS

### I. DNA Proficiency Test Records

Proctor argues the trial court erred in denying his motion
"to have the proficiency testing records of the DNA expert
disclosed." He asserts the proficiency test results were dis-

coverable under Rule 5, SCRCrimP, and pursuant to *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

The admissibility of DNA evidence in a criminal trial is a major event in regard to evidence against a defendant. The efficacy of DNA evidence is recognized by all afficionados in the criminal trial venue. The DNA expert conducting the analysis is a pivotal player in the laboratory activity. In order to be an accredited laboratory for DNA purposes, the proficiency rate of the DNA examiners is critical in analyzing the reliability of the testing procedure. Accreditation of the laboratory is only allowed if outside monitoring of the DNA examiners is done on the basis of blind and open proficiency tests. The gravamen of the discovery request in the case *sub judice* is the production of the DNA proficiency rating by the outside laboratory.

In the novel and intriguing evidentiary issue presented in this case, we explore the cornucopia of developing scientific knowledge as meshed with the precepts of due process. The State distills from prior precedent that the defendant is only entitled to limited information in the DNA theater of operations.

Agent Ira Jeffcoat filed an affidavit averring that all SLED examiners had passed every proficiency test. Two documents which address the issues concerning forensic DNA analysis and proficiency testing are the National Research Council Report published in 1992 (NRC I) and a second report published in 1996 (NRC II). Both documents agree that no laboratory has a zero error rate. The NRC I provides: "Laboratory error rates should be measured with appropriate proficiency tests and should play a role in the interpretation of results of forensic DNA typing. As discussed above, proficiency tests provide a measure of the false-positive and false-negative rates of a laboratory. *Even in the best of laboratories, such rates are not zero."* NRC I, p. 94 (emphasis added). The NRC II reads: "It addresses determination of DNA profiles and considers how laboratory errors (particularly false matches) can arise, how errors might be reduced, and how to take into account the fact that *the error rate can never be reduced to zero."* NRC II, back cover (emphasis added).

SLED takes the position that Agent Jeffcoat's affidavit is sufficient. The French phrase "pas du tout"[1] is applicable. Are the court and defense counsel required to accept the self-serving assertion by the SLED examiner that he and the other DNA examiners passed all proficiency testing? Does the law allow any meaningful review of the background and qualification of a DNA examiner? Are all litigants in a DNA evidence scenario bound by the statement emanating from the DNA expert witness that he or she passed all proficiency rating testing?

A commonsensical analysis compels this Court to conclude that a DNA expert, like all expert witnesses, is subject to scrutiny and query in regard to qualification and competency. Historically, this State has ruled that the expertise, ability and acumen of an expert witness is relevant and essential. No citation of authority is needed for the well settled rule of practice and procedure that every expert witness is subject to *voir dire* examination by the opposing party as to his or her qualifications before a final ruling by the trial judge is made as to competency or incompetency of the proffered expert witness.

## A. Rule 5, SCRCrimP

Proctor argues the proficiency test results were discoverable pursuant to Rule 5, SCRCrimP. We agree.

■ The requirements of Rule 5, as opposed to the constitutional dictates of *Brady,* are judicially created discovery mechanisms for use in criminal proceedings. *See State v. Kennerly,* 331 S.C. 442, 503 S.E.2d 214 (Ct.App.1998), *aff'd,* 337 S.C. 617, 524 S.E.2d 837 (1999). Rule 5 imposes different duties than *Brady. Id.* Rule 5(a)(1)(D), SCRCrimP, provides:

> Reports of Examinations and Tests. Upon request of a defendant the prosecution shall permit the defendant to inspect and copy any results or reports ... of scientific tests or experiments, or copies thereof, which are within the possession, custody, or control of the prosecution, the existence of which is known, or by the exercise of due diligence may become known, to the attorney for the prosecution, and which are *material to the preparation of the defense* or are

---

1. Not at all, not so.

*intended for use by the prosecution as evidence in chief at the trial.* (Emphasis added).

■ "The definition of 'material' for purposes of Rule 5 is the same as the definition used in the *Brady* context." *Kennerly,* 331 S.C. at 453, 503 S.E.2d at 220. Evidence is "material" under *Brady* only if there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different. *State v. Von Dohlen,* 322 S.C. 234, 471 S.E.2d 689 (1996). Once a Rule 5 violation is shown, reversal is required only where the defendant suffered prejudice from the violation. *State v. Trotter,* 322 S.C. 537, 473 S.E.2d 452 (1996); *Kennerly,* 331 S.C. at 453–54, 503 S.E.2d at 220.

The proficiency test results could very well be material to the preparation of Proctor's defense. All proficiency test results of the DNA analyst involved in the case must be produced. Defense counsel has the right to cross examine the DNA analyst regarding his or her performance on proficiency tests. A failing grade by the DNA analyst on his or her proficiency tests is clearly relevant in the judge's evaluation of the expert's competency and most probably reflects negatively on the reliability of the DNA evidence introduced at trial. The trial court abused its discretion in denying discovery of the proficiency test results pursuant to Rule 5.

As to the second prong of Rule 5, the State asserted prior to trial that it had no plans to introduce the proficiency test results in its case in chief at trial. During direct examination of Agent Jeffcoat, the State questioned him about the SLED laboratory's qualifications to perform DNA analysis. In describing SLED's quality control program, Agent Jeffcoat testified regarding proficiency testing. Thereafter, when asked by the State whether there was a "stated error rate" at "the SLED lab DNA station," Agent Jeffcoat answered: "[E]rror rate is, I guess, would be something, a form that you would apply some numbers to and come up with an overall error rate. We have never done that, developed an error rate. To answer your question, I mean, we have—we have been given proficiencies since 1991." Defense counsel objected stating, "Your Honor, we made a pretrial motion about being able to confront this piece of evidence, and we would move to exclude

this part of the testimony." The judge sustained the objection. Although the State elicited testimony regarding proficiency testing, the State did not present the actual test results as part of its evidence in chief at trial. Further, Agent Jeffcoat did not discuss the results of the proficiency tests.

## B. *Brady v. Maryland*

Proctor asserts he was entitled to the proficiency test results pursuant to *Brady* because he needed the test results for impeachment purposes. We agree.

 Compliance with *Brady* is a constitutional requirement. *See State v. Kennerly,* 331 S.C. 442, 503 S.E.2d 214 (Ct.App. 1998), *aff'd,* 337 S.C. 617, 524 S.E.2d 837 (1999). The *Brady* disclosure rule is grounded in the defendant's fundamental right to a fair trial mandated by the Due Process Clause of the Fifth and Fourteenth Amendments. *Id.*

 *Brady* requires the prosecution to disclose evidence which is favorable to a defendant and material to guilt or punishment. This applies to impeachment evidence as well as exculpatory evidence. *United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); *State v. Von Dohlen,* 322 S.C. 234, 471 S.E.2d 689 (1996). Evidence is "material" under *Brady* only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *Bagley,* 473 U.S. at 682, 105 S.Ct. at 3383, 87 L.Ed.2d at 494; *State v. Cain,* 297 S.C. 497, 377 S.E.2d 556 (1988). A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. *Bagley,* 473 U.S. at 682, 105 S.Ct. at 3383, 87 L.Ed.2d at 494; *State v. Taylor,* 333 S.C. 159, 508 S.E.2d 870 (1998). Reversal of a conviction is required only if the undisclosed evidence is material and the omission deprived the defendant of a fair trial. *State v. Jones,* 325 S.C. 310, 479 S.E.2d 517 (Ct.App. 1996); *State v. Freeman,* 319 S.C. 110, 459 S.E.2d 867 (Ct. App.1995).

In *State v. Bryant,* 307 S.C. 458, 415 S.E.2d 806 (1992), our Supreme Court discussed the materiality prong of *Brady:*

[T]he State must produce undisclosed evidence for the trial judge's inspection *once a defendant has established a basis for his claim that it contains material exculpatory or*

*impeachment evidence.* The trial judge should then rule upon the materiality of the evidence to determine whether the State must produce it for the defendant's use.

*Bryant,* 307 S.C. at 461–62, 415 S.E.2d at 808–09 (emphasis added)(citing *Pennsylvania v. Ritchie,* 480 U.S. 39, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987)).

In the present case, the undisclosed proficiency test results could very well be material to Proctor's case for impeachment and important for cross-examination purposes. SLED's contention that compiling the reports would be burdensome has no merit. After the tests were completed, the outside laboratory compiled the data and turned it over to SLED. We find the trial court abused its discretion in refusing to order disclosure of the proficiency test results pursuant to *Brady.*

### C. Other Jurisdictions

In some jurisdictions, a defendant is provided the underlying proficiency test results in discovery. *See Hodges v. Commonwealth,* 26 Va.App. 43, 492 S.E.2d 846 (1997)(where the trial court ordered discovery of the proficiency test data and the parties agreed the lab would provide a memorandum recounting the proficiency testing of a particular examiner, the trial court correctly exercised its discretion in denying the defendant's motion for further discovery regarding the underlying details of the test results); *Keen v. Commonwealth,* 24 Va.App. 795, 485 S.E.2d 659 (1997)(although the appellate court presumed that the trial court erred in refusing to allow discovery of the underlying proficiency test results, the error was deemed harmless in light of the other evidence presented at trial).

Academically and fundamentally, the issue has been dissected into relevant and consequential query to be used at trial before the fact finder. A review of cases in other jurisdictions reveals a plethora of issues raised relating to DNA proficiency tests:

- Is the laboratory error rate relevant in the calculation of the overall odds claimed by the DNA analyst?

- Is the proficiency test data relevant to the credibility of the DNA evidence?

- Should the jury be allowed to consider proficiency test results/records along with the DNA matching data?
- Does the DNA examiner's performance on the proficiency tests go to the weight of the DNA evidence?

*See, e.g., State v. Tankersley*, 191 Ariz. 359, 956 P.2d 486 (1998)(determining that if procedures implementing a scientifically accepted testing principle are so seriously flawed that results are rendered unreliable, trial court should not admit the evidence, but once adequate foundation is established, complaints of laboratory error or incompetence are considered by trier of fact in assessing weight of evidence); *Commonwealth v. Teixeira*, 40 Mass.App.Ct. 236, 662 N.E.2d 726 (1996)(explaining weaknesses in laboratory's proficiency testing go to weight to be ascribed to evidence of DNA match, not to its admissibility); *State v. Moore*, 268 Mont. 20, 885 P.2d 457 (1994), *overruled on other grounds by State v. Gollehon*, 274 Mont. 116, 906 P.2d 697 (1995)(finding challenge to proficiency testing of DNA expert goes to weight of evidence, not its admissibility; even if error rate of expert's proficiency tests presented challenge to reliability of polymerase chain reaction analysis, that argument would not result in exclusion of PCR evidence, as error rate would only be one factor considered in determining admissibility); *Keen v. Commonwealth*, 24 Va.App. 795, 485 S.E.2d 659 (1997)(concluding that even if the proficiency test results of expert had been admitted and could have been used by Keen to establish state laboratory had previously made erroneous findings, this information would not have affected admissibility of the DNA evidence, but rather, would have only affected the weight the fact finder accorded the DNA evidence); *State v. Copeland*, 130 Wash.2d 244, 922 P.2d 1304 (1996)(holding that laboratory error is a matter of weight and not admissibility under *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923); under Rule of Evidence 702, if lab error or error rates are so serious that results are not helpful to the jury, the trial court may in its discretion rule the evidence inadmissible); *State v. Cauthron*, 120 Wash.2d 879, 846 P.2d 502, 512 (1993)(noting that thorough cross-examination of State's experts on possibility of error in laboratory and errors in proficiency tests allowed jury to get "a balanced picture" of the DNA evidence); National Research Council, *The Evaluation of Forensic DNA Evidence*

(1996)(stating proficiency testing bears on weight that should be accorded forensic test results).

### D. Harmless Error

The State maintains that, even if the trial judge erred in denying disclosure of the proficiency test results under Rule 5 or *Brady,* such error is harmless. We disagree.

The trial judge in the instant case erred in denying disclosure of the proficiency test results under Rule 5 and *Brady.* Clearly, the error was *not* harmless. Ignoring the DNA evidence presented at trial, there was substantial disputation of evidence regarding guilt. The record does not disclose overwhelming evidence to support Proctor's conviction in the absence of the DNA evidence. We hold there is a reasonable probability that the disclosure of SLED's proficiency test results would reasonably have affected the outcome of the trial. *See State v. Mitchell,* 286 S.C. 572, 336 S.E.2d 150 (1985)(error is harmless when it could not reasonably have affected the result of the trial).

### II. Competency

Proctor contends the trial court erred in finding him competent to stand trial. We disagree.

A trial court's determination of competency will be upheld on review if it has evidentiary support and is not against the preponderance of the evidence. *State v. Nance,* 320 S.C. 501, 466 S.E.2d 349 (1996). "The test for competency to stand trial or continue trial is whether the defendant has the sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and whether he has a rational, as well as a factual, understanding of the proceedings against him." *State v. Bell,* 293 S.C. 391, 395–96, 360 S.E.2d 706, 708 (1987)(citing *Dusky v. United States,* 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960)). The defendant bears the burden of proving his incompetence by a preponderance of the evidence. *Nance,* 320 S.C. at 504, 466 S.E.2d at 351; *State v. Lee,* 274 S.C. 372, 264 S.E.2d 418 (1980).

Proctor suffered severe brain damage and paralysis to both legs and one arm as a result of his car accident. He was found incompetent to stand trial in 1993. The State moved to

have Proctor re-evaluated in 1996. After a competency hearing, the trial court determined in June of 1997 that Proctor was competent to stand trial.

Another competency hearing was held immediately preceding Proctor's March 1998 trial. Proctor testified at the hearing he had been in court several times for competency hearings and for a Charleston County trial.[2] He was aware he had previously been convicted of "rape" and breaking and entering, he knew the name of the Charleston County solicitor, and he knew that the judge in the Dorchester County case also presided over the Charleston County case. Proctor could name his three attorneys, but he believed one attorney could not adequately represent him because she was upset that she shared the same last name with Proctor. Proctor could not recall where he was on the date of the criminal sexual conduct involving Victim. He did not recall reviewing the evidence in the Charleston County case or in the Dorchester County case with his attorneys. Proctor listed and defined the crimes he was charged with, understood the seriousness of the crimes, and noted they carried long sentences. Proctor stated he learned the roles of the judge and jury by watching "Matlock" on television, but he believed a jury consisted of eleven jurors who did not have to reach a unanimous verdict. Proctor declared he understood what his attorneys discussed with him and he believed he could communicate with them.

Dr. Catherine Lewis, a forensic psychiatrist, evaluated Proctor on four occasions and testified regarding his competency. Proctor did not recall the evidence the State had against him but he described the type of evidence which could be used in a CSC trial. Dr. Lewis believed that despite Proctor's memory problem, Proctor would benefit from having a notebook or cards summarizing the evidence and would be able to work with his attorneys in discussing the weight of the evidence. Dr. Lewis opined Proctor was competent to stand trial because he understood the trial proceedings and he was able to interact with his attorneys and would ask questions if he did not understand.

---

2. A few weeks prior to this trial, Proctor was convicted of one count of first degree burglary and four counts of first degree CSC as to a woman in Charleston County.

Dr. Harold Morgan, a forensic psychiatrist, evaluated Proctor eight times and testified concerning his competency. Proctor told Dr. Morgan during one evaluation that he received a harsher sentence in the Charleston County trial because the trial judge became angry when Proctor spoke with his attorneys. Dr. Morgan noted Proctor had a factual understanding of the judicial process and the charges against him but opined Proctor did not have a rational understanding of the process. Dr. Morgan doubted that providing Proctor with notebooks or cards summarizing the evidence in the case would aid Proctor because his memory deficit rendered him unable to retain information and unable to process what happens in court. He believed Proctor was not competent to stand trial due to Proctor's memory problems and because his rational understanding was impaired.

After Dr. Lewis and Dr. Morgan testified, Proctor again took the stand. He stated he did not recall the questions previously asked of him or the testimony of the psychiatrists.

The trial court found Proctor did not meet his burden of showing he was incompetent and affirmed its prior finding that Proctor was competent to stand trial. After the jury began to deliberate in this case, Proctor's counsel informed the court of several instances throughout the trial where Proctor could not recall recent information or was confused regarding the proceedings.

Proctor concedes he had a factual understanding of the proceedings against him. He contends the trial court erred in finding him competent to stand trial because his memory deficits rendered him unable to rationally assist his attorneys with the defense. Although there was evidence that Proctor was unable to recall some information unless it was constantly repeated, Proctor did not meet his burden of proving he was unable to assist his attorneys. Proctor understood the nature of the charges against him, the seriousness of the charges, and the adversarial nature of the proceedings. He consulted his attorneys when he had questions. Despite Proctor's amnesia regarding the events surrounding the crime, he was able to rationally discuss the trial proceedings with counsel and comprehend them.

We conclude there was ample evidence to support the trial court's finding that Proctor was competent to stand trial despite his amnesia. Further, the trial judge's determination of competency is not against the preponderance of the evidence.

## CONCLUSION

We find the trial judge did not err in finding Proctor competent to stand trial. The State's evidence reveals that Proctor has the sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and Proctor possesses a rational, as well as a factual, understanding of the proceedings against him.

We conclude the trial court erred in denying Proctor's motion to have the proficiency test records of the DNA expert disclosed. We hold that, pursuant to Rule 5, SCRCrimP and *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), a defendant is entitled to the pre-trial production of DNA proficiency test records of the SLED DNA expert. We bifurcate the mandate of production:

1) outside laboratory proficiency tests and records and

2) SLED laboratory proficiency tests and records.

As to the outside laboratory proficiency tests and records done in the accreditation process, we order the pre-trial production of *all* records of proficiency testing of personnel in the laboratories where Restriction Fragment Length Polymorphism (RFLP) and Polymerase Chain Reaction (PCR) analyses, the two types of DNA testing procedures, are performed in the case and records of laboratory error rates resulting from external blind forensic DNA analyses or any other studies pertaining to error rates.

As to the SLED laboratory proficiency tests and records, we limit the production to the *results* of proficiency testing of personnel and the *results* of laboratory error rates resulting from internal blind forensic DNA analyses or any other studies pertaining to error rates.

Accordingly, we remand the case to the Dorchester County Court of General Sessions and direct that an *in camera Bryant* hearing be held to determine whether the records and

information produced are *material* to the defendant's case. If the Circuit Court Judge [3] concludes the records and information are material, the judge shall order a new trial. If the records and information are *not* material, the Circuit Judge shall affirm the convictions of Duncan R. Proctor.

**AFFIRMED IN PART and REMANDED.**

HEARN, C.J., and CURETON, J., concur.

---

**3.** We note the trial judge has retired. The remand of this case is to the Circuit Court. Any Circuit Judge assigned to the Dorchester County venue has jurisdiction to conduct the *in camera Bryant* hearing.