595 S.E.2d 476

The STATE, Petitioner,

v.

Duncan PROCTOR, Respondent.

No. 25809.

Supreme Court of South Carolina.

Heard Dec. 4, 2003.

Decided April 19, 2004.

418

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Charles H. Richardson, and Assistant Attorney General Deborah R.J. Shupe, all of Columbia, and Walter M. Bailey, Jr., of Summerville, for Petitioner.

Chief Attorney Daniel T. Stacey, of Columbia, and Christopher W. Adams, of Atlanta, for Respondent.

Justice PLEICONES:

We granted certiorari to review a Court of Appeals' decision remanding respondent's appeal to the circuit court with instructions to hold a hearing and determine whether informa-

tion not disclosed by the State was material to the defense. *State v. Proctor*, 347 S.C. 587, 556 S.E.2d 418 (Ct.App.2001). Because we hold there is no reasonable possibility that, had the information sought been disclosed, the result of respondent's trial would have been different, we reverse the Court of Appeals.[1]

## FACTS

Respondent was convicted of first degree criminal sexual conduct, assault with intent to kill, and possession of a firearm during the commission of a violent crime. These convictions arise out of a housebreaking and subsequent assault of the victim ("J").

The State proposed to admit DNA test results linking respondent to semen recovered from J. The DNA evidence had been processed at the South Carolina Law Enforcement Division (SLED) lab. Respondent sought to discover SLED's internal DNA proficiency test results in order to explore the possibility of challenging the accuracy of the lab's assessments.[2] SLED conducts both 'blind' and 'open' tests; the lab analyst is aware of the test in the 'open' situation but not in the 'blind.'

In response to respondent's request for the proficiency test information, SLED produced an affidavit from SLED Lt. Ira Jeffcoat that outlined the general test procedures, and stated that the SLED examiners have never made an incorrect 'match' in any proficiency test. At a pretrial hearing,[3] the

---

1. We granted certiorari to review a Court of Appeals' decision granting respondent this same relief with regard to his convictions in Charleston County. *State v. Proctor*, 348 S.C. 322, 559 S.E.2d 318 (Ct.App.2001). In an opinion filed today, we reverse that decision as well. *State v. Proctor*, 358 S.C. 424, 595 S.E.2d 480 (2004).

2. Proficiency tests determine how accurately an analyst applies validated technology; their purpose is to determine what difficulties a particular examiner may encounter when applying specific methods. Edward J. Imwinkelried, *DNA Typing: Emerging or Neglected Issues*, 76 Wash. L.Rev. 413, 459 (2001).

3. The pretrial hearing combined respondent's requests made in this case with his requests made in the Charleston County case. A single order was issued addressing both requests. Accordingly, our analysis here mirrors that in our Charleston opinion.

trial judge denied respondent's discovery request, finding respondent failed to show how the proficiency testing information sought would be relevant and material.

## ISSUE

Did the Court of Appeals err in remanding
this matter to the trial court?

## ANALYSIS

As we understand respondent's argument, he seeks the proficiency test results not to attack the methodology used or results obtained in his particular case, but as the predicate for his expert to derive the SLED DNA lab's 'lab error rate.' In turn, respondent's expert would use that rate to evaluate the accuracy of SLED's probability estimates. Further, if SLED's proficiency test results were not perfect, as represented by Lt. Jeffcoat, then they could potentially be used as impeachment evidence.

Respondent contends he is entitled to another hearing to determine whether the proficiency test results are material under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963),[4] and/or Rule 5(a)(1)(D), SCRCrimP.[5] The materiality test is the same under *Brady* and under the rule. *State v. Kennerly,* 331 S.C. 442, 503 S.E.2d 214 (Ct.App. 1998), *aff'd,* 337 S.C. 617, 524 S.E.2d 837 (1999). Evidence is material under *Brady* if there is a reasonable probability that had the evidence been disclosed, the result of the proceeding would have been different. *State v. Von Dohlen,* 322 S.C. 234, 471 S.E.2d 689 (1996). Impeachment evidence, as well as evidence that is relevant to guilt or punishment, can be material. *Id.*

---

4. "[T]he suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or to punishment...." *Brady,* 373 U.S. at 87, 83 S.Ct. 1194, 1196–1197, 10 L.Ed.2d 215, 218.

5. "[U]pon request ... the prosecution shall permit the defendant to inspect and copy any results or reports of ... scientific tests or experiments ... which are material to preparation of the defense...." Rule 5(a)(1)(D), SCRCrimP.

The Court of Appeals found "the undisclosed proficiency test results could very well be material to [respondent's] case for impeachment and important for cross-examination purposes" and remanded so that a circuit court judge could reconsider whether to order disclosure of the test results. While we agree that respondent's original pretrial hearing was flawed, we find no error warranting a remand.

Where a defendant makes a threshold showing that the evidence he seeks is material within the meaning of *Brady* and Rule 5, the trial judge should conduct a hearing. *State v. Bryant*, 307 S.C. 458, 415 S.E.2d 806 (1992). Here, respondent made that showing. He presented evidence that defense experts examining proficiency tests from other labs have found errors that demonstrated flaws in the test lab's methodology. Further, he presented evidence that no DNA lab has a "zero error rate" on DNA proficiency exams. Having met this threshold requirement, the trial judge should have examined the material *in camera*.[6] The trial judge's reliance on Lt. Jeffcoat's affidavit in lieu of conducting his own *in camera* examination was error. *State v. Bryant, supra* (error for trial judge to rely on State's witness's representation of contents rather than personally inspect materials).

Although we conclude that respondent made an adequate threshold showing entitling him to a full *Bryant* hearing, we find that error does not require remand:

For *Brady* purposes, in determining the materiality of nondisclosed evidence, an appellate court must consider the evidence in the context of the entire record. *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).

---

6. At oral argument, the State contended that the raw material respondent sought would be meaningless to the trial judge unless he hired his own expert to assist him. We assume that, in addition to the raw data, the materials would include a summary of the results that would not require expert interpretation. Further, the State acknowledged at respondent's pretrial hearing that it had, in fact, given this type of information to a circuit court judge in another case. We are not prepared to say that the State can arbitrate whether scientific information is too sophisticated for the average trial judge. Further, Lt. Jeffcoat referred to the proficiency testing several times in his testimony establishing the *bona fides* of the SLED DNA lab. So long as the State relies upon these results to bolster the lab's credibility, it should not be surprised that defense counsel will seek to look behind its representations.

However, the court should not consider the sufficiency of the evidence. The court's function is to determine whether the appellant's right to a fair trial has been impaired. *State v. Osborne*, 291 S.C. 265, 353 S.E.2d 276 (1987); *State v. Goodson*, 276 S.C. 243, 277 S.E.2d 602 (1981). *State v. Taylor*, 333 S.C. 159, 177, 508 S.E.2d 870, 879 (1998).

For purposes of determining whether respondent was denied a fair trial, we will assume that the undisclosed proficiency tests would have revealed that the SLED DNA lab did not, in fact, have a perfect record. We proceed to consider not just the evidence against respondent at trial, but the context in which the DNA evidence was presented.

J positively identified respondent as her assailant. She testified that the assault lasted approximately twenty minutes, and that during that period she had many opportunities to observe him. In a criminal sexual conduct case, the victim's degree of attention is presumably acute. *State v. Gambrell*, 274 S.C. 587, 266 S.E.2d 78 (1980). Pubic hairs consistent with respondent's were recovered from the scene, and blood evidence showed the rapist was a Group B secretor. Respondent is a Group B secretor, a trait shared by 9% of whites and 16% of African–Americans.[7] Finally, J identified a gun recovered when respondent was arrested as being similar to the one used by her attacker.

Lt. Jeffcoat testified that the SLED lab DNA analysts participated in proficiency tests in order to meet certain lab accreditation requirements. When he began to testify to the results of those proficiency tests, respondent's objection was sustained. In this case, the jury never heard evidence that the SLED lab had a perfect record on those tests, and thus respondent was not denied an opportunity to impeach Lt. Jeffcoat. Lt. Jeffcoat testified that the comparison of the DNA samples with a sample from respondent resulted in an "unprecedented" match of six out of seven probes. Respondent acknowledges that nothing in the proficiency test results would have permitted him to question these results.

Finally, Lt. Jeffcoat was permitted to testify that the probabilities of an individual unrelated to respondent having the

---

7. Respondent is of mixed Caucasian and African heritage.

same DNA profile as that found in the semen sample was "1 in 45 billion Caucasians, and 1 in 3.7 billion blacks." Had the proficiency test results been provided, respondent's experts could have determined a 'lab error rate,' and in turn would have testified [8] to probabilities lower than those testified to by Lt. Jeffcoat.

We find that the nondisclosure of proficiency test results was not material. The other evidence was formidable: the test results could only have reduced the probabilities. Even if the 'lab error rate' resulted in a 90% reduction of Lt. Jeffcoat's probabilities, those numbers would still be staggering: 1 in 450 million Caucasians and 1 in 37 million African–Americans. Further, Lt. Jeffcoat acknowledged during his testimony that errors are made in every lab, and that those errors affect the validity of the probability determination.

Respondent was not denied a fair trial because the SLED lab proficiency test results were not disclosed to him. *State v. Taylor, supra.* We therefore reverse the decision of the Court of Appeals remanding this matter for further proceedings.

REVERSED.

TOAL, C.J., MOORE, WALLER and BURNETT, JJ., concur.

---

8. There appears to be a disagreement among experts as to the validity or usefulness of a lab error rate. We will assume for purposes of our decision today that this evidence would be admitted, but express no final judgment as to this type of evidence's admissibility.